IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

GEORGE R. LEBOEUF,                            :

                          Plaintiff,

    -vs-

HEWLETT-PACKARD COMPANY,

                          Defendant.         :

Case No. 3:03-cv-463

District Judge Thomas M. Rose
Chief Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

This case is before the Court on Defendant Hewlett-Packard Company's (HP) Motion for Summary Judgment. (Doc. 11).

Plaintiff George R. LeBoeuf filed this action against HP, his former employer, alleging that HP violated the Uniformed Services Employment and Reemployment Rights Act (USERRA) when it assigned him to different sales accounts and again when it terminated his employment. (Doc. 1). HP has moved for summary judgment arguing that Mr. LeBoeuf is not able to establish his claim under the USERRA because he cannot establish that his military service was a motivating factor in HP's decision to assign him to different sales accounts or in its decision to terminate his employment. Mr. LeBoeuf argues that HP cannot carry its burden on summary judgment by establishing that it would have made the same decisions in the absence of consideration of his military obligation.

**Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157-59 (1970).  Nevertheless, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;  the requirement is that there be no *genuine* issue of *material* fact.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).  Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party will not be able to produce sufficient evidence at trial to withstand a Rule 50 motion for judgment as a matter of law.  *See, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir. 1989).  If, after sufficient time for discovery, the opposing party is unable to demonstrate that he or she can do so under the *Liberty Lobby* criteria, summary judgment is appropriate.  *Id.*  The opposing party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd.*

*v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323; *see also, Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (citation omitted). In ruling on a motion for summary judgment (in other words, determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.,* 260 F.3f 574, 581 (6th Cir. 2001). "Materiality is determined by the substantive law claim." *Boyd v. Baeppler,* 215 F.3d 594, 599 (6th Cir. 2000). An issue is genuine if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.,* 14 F.3d 1143, 1148 (6th Cir. 1994), quoting *Anderson,* 477 U.S. at 248. Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material

3

fact. *Simmons-Harris v. Zelman,* 234 F.3d 945, 951 (6th Cir. 2000), *rev'd on other grounds,* 536 U.S. 639 (2002). Thus, a factual dispute which is merely colorable or is not significantly probative will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.), *cert. denied* 510 U.S. 976 (1993); *see also, Int'l Union United Auto., Aerospace & Agriculture Implement Workers of America v. BVR Liquidating, Inc.,* 190 F.3d 768, 772 (6th Cir. 1999), *cert. denied* 529 U.S. 1076 (2000).

The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street,* 886 F.2d at 1479. A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252. If, after sufficient opportunity for discovery, the non-moving party is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.,* 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enterprises v. Elvisly Yours, Inc.,* 936 F.2d 889, 895 (6th Cir. 1991).

The Court may grant summary judgment on the issue of causation when warranted. *Bailey v. Floyd County Bd. or Education.,* 106 F.3d 135, 145 (6th Cir, 1997). For example, reliance solely on the fact that an adverse employment decision occurred after the alleged protected conduct is insufficient. *Id.* at 144-45. "A mere scintilla of evidence is [likewise] insufficient" to create a

4

genuine issue of material fact.  *Landham v. Lewis Galoob Toys, Inc.,* 277 F.3d 619, 622 (6th Cir. 2000).

## Analysis

With these principles in mind, the facts of this case construed in the light most favorable to Mr. LeBoeuf and for purposes of the present motion are as follows.

Mr. LeBoeuf graduated from Wright State University in 1983 with a bachelor of science degree in business administration.  Deposition of George R. LeBoeuf, July 8, 2005, at 7 (filed Sept. 27, 2005)(Doc. 12, Ex. 1 attached thereto).  In September, 1983, Mr. LeBoeuf went on active duty with the United States Army (Army) and he remained on active duty status until about January, 1987.  LeBoeuf Depo. at 36-37.  Mr. LeBoeuf subsequently went on reserve status with the Army. *Id*. at 37.  Mr. LeBoeuf then attended graduate school during the period January, 1987, to July, 1988.  *Id.* at 38.  Mr. LeBoeuf earned a master of science degree in 1988, following which he worked as vice president for sales for LLD Enterprises, a family business.  *Id.* at 38-39.

 In January, 1991, Mr. LeBoeuf started working for VeriFone in sales as an account executive.  *Id.* at 39-40.  In about March, 1997, HP acquired VeriFone and in April, 1998, Mr. LeBoeuf became employed by HP.  *Id.*  at 40-41.  As a part of the hiring process, Henry Potts, HP's district manager, interviewed Mr. LeBoeuf.  Deposition of Henry Potts, July 12, 2005, at 11 (filed Sept. 27, 2005)(Doc. 14, Ex. 1 thereto).  During that interview, Mr. LeBoeuf and Mr. Potts discussed Mr. LeBoeuf's military reserves obligation.  *Id.* at 12; 16.  In addition, Mr. LeBoeuf included his military service on his application for employment with HP.  *Id.,* Ex. C attached thereto.  When he

5

began his employment with HP, Mr. LeBoeuf was an OpenView software sales representative.

Prior to 2001, Mr. LeBoeuf's Army reserves training was conducted on a fragmented basis primarily over weekends; as a result he missed only a few days of work with HP, his civilian employer. LeBoeuf Depo. at 66-67. Starting in 2001, Mr. LeBoeuf's Army reserves training was conducted during a two-week session in the summer. *Id.* at 66; 68-69.

In 2001, Mr. LeBoeuf's training was held August 5 through August 18. *Id.* at 131; LeBoeuf Depo. Ex. 1 attached thereto at 109. When Mr. LeBoeuf received notice from the Army about his 2001 training obligation, he approached someone in HP's human resource office about taking military reserves leave and that individual told Mr. Le Boeuf that she didn't know of any other reservists at HP and that she didn't even know about HP's military leave policy. LeBoeuf Depo. at 61. Eventually, Mr. LeBoeuf followed HP's military leave policy, requested leave, and HP granted his request. *Id.* at 70. While Mr. LeBoeuf was attending military training, in accordance with its military leave policy, HP paid Mr. LeBoeuf the difference between his military pay, minus some exceptions, and his regular HP salary. *Id.* at 71-72.[1] In addition, during his two-week military training, HP continued to carry Mr. LeBoeuf in its fringe benefit program. *Id.* at 72. When he completed his 2001, military training Mr. LeBoeuf returned to his same job at HP at the same rate of pay. *Id.*

Following the terrorist attacks on September 11, 2001, Mr. Potts called Mr. LeBoeuf at his home office and asked Mr. LeBoeuf if, in view of the events of September 11, Mr. LeBoeuf thought he might be activated by the Army. *Id.* at 75-76. Mr. Potts explained to Mr. LeBoeuf that he (Mr.

---

[1] In practice, HP continued to pay Mr. LeBoeuf his regular HP salary and upon receiving his military pay, Mr. LeBoeuf gave HP that amount. *Id.* at 70-71.

6

Potts) and Scott Strubel, HP's regional director, were working on staffing for the upcoming fiscal year and wanted to know for planning purposes whether Mr. LeBoeuf would be called to active duty.  *Id.*  Mr. LeBoeuf told Mr. Potts that he did not know what would happen with respect to his military status but that given the state of his current sales volume, he wondered if going on active duty with the Army would   mean earning more money than he was earning at HP.  *Id.* at 51; 76.  In response, Mr. Potts asked Mr. LeBoeuf if "he'd rather get shot".  *Id.* at 52; 76.  Mr. LeBoeuf advised Mr. Potts that one of several things could happen with respect to his military commitment: he might remain inactive in the reserves; he could be called for active duty with the Army and sent to Korea; or he could volunteer for active duty with the Army.  *Id.* at 65-68.  Subsequently, Mr. Strubel called Mr. LeBoeuf and asked him if he had received any military orders putting him on active duty.  *Id.* at 74, 77.  Mr. Strubel explained that he was inquiring because he needed to know what HP's staffing needs would be for the upcoming fiscal year.  *Id.*

During 2001, Mr. Potts was HP's district sales manager over OpenView sales representatives in the midwest region who were assigned to big name accounts.  Mark Schlueter was the district manager over OpenView representatives in the midwest region who were assigned to the remainder of the customer base.  Because Mr. LeBoeuf was assigned to named accounts, he reported to Mr. Potts.  Mr Potts, in turn, reported to Mr. Strubel, HP's regional director.

In November, 2001, HP reorganized its Midwest Region and  split the region into the East and West Districts.  Deposition of Scott Strubel, July 11, 2005, at 19-21 (filed Sept. 27, 2005)(Doc. 13, Ex. 1 attached thereto).  As a result of the reorganization, Mr. Potts was responsible for the West District and Mr. Schlueter was responsible for the East District.  *Id.*   HP assigned sales representatives according to the district in which he or she lived.  *Id.*  As a result, several sales

7

representatives who formerly reported to Mr. Potts were reassigned to Mr. Schlueter. *Id.* at 20-21; 78-79. Similarly, several who had previously reported to Mr. Schlueter were reassigned to Mr. Potts. *Id.* HP reassigned Mr. LeBoeuf to Mr. Schlueter because Mr. LeBoeuf lived in Ohio and Ohio was in the East District. *Id.* 29; 77.

There was one exception to the reassignments made on the basis of geographical location. Melissa Cooper was a sales representative who lived in Ohio. *Id.* at 79. Ms. Cooper's single account assignment was all the business units of the General Electric Company (GE). *Id.* Prior to the reorganization, Ms. Cooper reported to Mr. Potts. *Id.* At one time, Mr. Potts had been assigned to GE and he had developed a substantial relationship with General Electric. *Id.* at 79-80. HP decided to have Ms. Cooper continue to report to Mr. Potts in view of Mr. Pott's significant working relationship with GE. *Id.* Prior to the reorganization, Mr. LeBoeuf had responsibility for GE IT Services which was a small division of GE. *Id.* at 80. As a part of the reorganization, HP brought all of GE into one account and assigned the account to Ms. Cooper. *Id.*

At the same time that HP was reorganizing the Midwest Region, it created a new district to target network service providers which it called the NSP District. *Id.* at 25. The NSP District was organized on the basis of accounts and not on the basis of geographical location. *Id.* at 28. HP transferred some of Mr. LeBoeuf's accounts to the new NSP District. *Id.* at 29. Additionally, HP assigned Mr. LeBoeuf new accounts and as a result he had new sales, new products, and new target customers. LeBoeuf Depo. at 86. Mr. LeBoeuf's new accounts were in various industries and included several major companies such as Kroger and Fifth-Third Bank. *Id.* at 85-86; 113-15.

In 2002, Mr. LeBoeuf again received notice to report for Army reserves training. *Id.* at 81-82. Mr. LeBoeuf requested military leave time to attend training August 17 through August 30, and

HP approved Mr. LeBoeuf's request for military leave. LeBoeuf Depo. at 81. As it did in 2001, during his 2002, military reserves commitment, HP paid Mr. LeBoeuf the difference between his military pay and his HP pay and it continued his fringe benefits. *Id.* at 81.

Also in August, 2002, HP was involved in a company-wide workforce restructuring project. Deposition of Mark J. Schlueter, Aug. 15, 2005, at 24-25 (filed Sept. 27, 2005)(Doc. 15, Attachment 1 thereto). The decisions about the restructuring of the workforce in the Midwest Region were made by Mr. Potts, Mr. Strubel, and Mr. Schlueter. *Id.*; Strubel Depo. at 87-88. In determining which sales personnel to lay off, HP considered five (5) factors: (1) sales revenues relative to HP's investment in the number of employees in a particular geographic area; (2) an employee's anticipated or proposed sales funnel or pipeline; (3) whether the employee had significant customer relationships; (4) the employee's skill set; and (5) the employee's ability to work as a team member with the larger extended HP team that calls on a customer. *Id.* at 92.

Mr. Strubel and Mr. Schlueter decided to lay off Mr. LeBoeuf as part of the workforce restructuring. Schlueter Depo. at 24-26. One of the reasons they decided to layoff Mr. LeBoeuf was that he was located in Ohio, particularly in southern Ohio. Strubel Depo. at 174. Specifically, HP had two (2) sales representatives in northern Ohio who served the Cleveland, Akron, and Pittsburgh areas and three(3) sales representatives in southern Ohio who served the Dayton, Cincinnati, and Columbus areas. *Id.* at 174-75. HP decided that it needed only two (2) sales representatives in southern Ohio. *Id.* After comparing the three (3) sales representatives in southern Ohio using the above identified five (5) factors, Mr. Strubel and Mr. Schlueter decided to lay off Mr. LeBoeuf. *Id.* at 189-90; Schlueter Depo. at 26-27.

On September 3, 2002, after Mr. LeBoeuf returned from his two-week military leave, Mr.

9

Schlueter notified Mr. LeBoeuf that HP was laying him off as a part of the workforce restructuring. Schlueter Depo. at 74-76; LeBoeuf Depo. at 92-93. In addition to Mr. LeBoeuf, HP also laid off Carl VanFleet who was a sales representative in Mr. Strubel's Midwest Region and Don Woods who was a solution architect also in Mr. Strubel's Midwest Region[2]. Strubel Depo. at 91-92.

None of the HP personnel involved in the decision to terminate Mr. Leboeuf's employment had ever served in the military. Specifically, Mr. Strubel had no military service, *Id.* at 16, Mr. Schlueter had no military experience, Schlueter Depo. at 7, and Mr. Potts had no military service. Potts Depo. at 69. Mr. Potts was in ROTC for a time when he was in college, but he told Mr. LeBoeuf that he didn't complete ROTC because "chasing pussy you can't wear a uniform." LeBoeuf Depo. at 133-34. When Mr. LeBoeuf first joined Mr. Potts' organization, Mr. Potts called Mr. LeBoeuf a "weekend warrior" which Mr. LeBoeuf thinks is largely viewed as derogatory. *Id.* Mr. LeBoeuf was also offended by Mr. Potts' remark about "getting shot". *Id.*

In March, 2004, following the termination of his employment with HP, Mr. LeBoeuf, then a major in the Army reserves, was mobilized and sent to Korea where he stayed until September, 2004. *Id.* at 10; 32. In December, 2004, Mr. LeBoeuf was promoted to the rank of Lieutenant Colonel and in April, 2005, he was again activated and assigned to duty at the Pentagon. *Id.* at 32; 33; 25.

As noted above, Mr. LeBoeuf alleges that HP violated the USERRA when, as a part of its reorganization, it reassigned him to Mr. Schlueter's East District and again when it terminated his employment.

USERRA basically prohibits employers from discriminating against individuals who serve

---

[2] Mr. VanFleet and Mr. Woods were located in western Michigan. Strubel Depo. at 91.

10

in the armed forces.  USERRA provides in part:

> **(a)** A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has a obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.
>
> **(b)** An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter. The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.
>
> **(c)** An employer shall be considered to have engaged in actions prohibited—
> **(1)** under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service; or
> **(2)** under subsection (b), if the person's (A) action to enforce a protection afforded any person under this chapter, (B) testimony or making of a statement in or in connection with any proceeding under this chapter, (C) assistance or other participation in an investigation under this chapter, or (D) exercise of a right provided for in this chapter is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action, testimony, statement, assistance, participation , or exercise of a right.
> ...

38 U.S.C. §4311.

Congress enacted section 4311 of Title 38 in response to the Supreme Court's decision in

*Monroe v. Standard Oil Co.,* 452 U.S. 549 (1981), where the Court "held that USERRA's antecedent, the Vietnam Era Veterans' Readjustment Assistance Act of 1974 'was enacted for the significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated *solely by* reserve status.'" *Curby v. Archon,* 216 F.3d 549, 556 (6th Cir. 2000) quoting *Monroe,* 542 U.S. at 559 (emphasis in original).  After *Monroe*, Congress enacted section 4311 to clarify that a violation of USERRA occurs even when an employee's exercise of military leave rights is just "*a motivating factor*" in the employer's action.  *Curby, supra.* (emphasis in original).  Stated otherwise, Congress intended to lessen, but not eliminate, a veteran's obligation to show that the employer's adverse decision was related to his or her service in the armed forces.  *Id.*   In addition, with subsection (c) Congress gave employers a defense if they can show that they would have taken the same action, notwithstanding their employee's military leave.  *Cf. Curby, supra.*

"Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries."  *Schmauch v. Honda of America Manufacturing, Inc.,* 295 F.Supp.2d 823, 835 (S.D.Oh. 2003), quoting *Hill v. Michelin N. Am., Inc.,* 252 F.3d 307, 312-13 (4th Cir. 2001), citing *Coffy v. Republic Steel Corp.,* 477 U.S. 191, 196 (1980)(USERRA's antecedent statute was "to be liberally construed for the benefit of the returning veteran").

The Congressional Record and the courts which have interpreted USERRA indicate that the burden-shifting framework approved by the Supreme Court in *NLRB v. Transportation Management*

12

*Corp.,* 462 U.S. 393 (1983)[3] is to be used to determine whether an employer discharged a reservist in violation of USERRA. *Martin v. Autozone, Inc.,* No. 2-04-cv-213, 2005 WL 2250679 at *6 (S.D.Ohio Sept. 15, 2005), quoting *Brandsasse v. City of Suffolk, Va.,* 72 F.Supp.2d 608, 617 (D.Va. 1999). Under this legal framework, a claimant must first establish a *prima facie* case of discrimination by showing by a preponderance of the evidence that his protected status was a motivating factor in the adverse employment action. *Martin, supra.,* citing *Curby,* 216 F.3d at 557.

To establish a certain factor as a motivating factor, a claimant need not show that it was the sole cause of the employment action, but rather that it is one of the factors that "a truthful employer would list if asked for the reasons for its decision." *Martin, supra.,* quoting *Kelley v. Maine Eye Care Ass'n,* 37 F.Supp.2d 47, 54 (D.Maine 1990) and citing *Robinson v. Morris Moore,* 974 F.Supp. 571, 575 (E.D. Tx. 1997). Indeed, "military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Martin, supra.,* quoting *Robinson*, 974 F.Supp. at 576, citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250 (1989)[4].

Absence of direct evidence of improper motivation is not fatal to a plaintiff's USERRA case. "Improper employer motivation may be inferred from circumstantial as well as direct evidence." *Cf. W.F. Bolin Co. v. Nat'l Labor Relations Board,* 70 F.3d 863, 871 (6th Cir. 1995)(holding in the unfair labor context).

---

[3] In *Office of Workers' Compensation Programs v. Greenwich Collieries,* 512 U.S. 267 (1994), the Court abrogated *Transportation Management Corp.,* to the extent of its application to section 7 of the Administrative Procedure Act, 5 U.S.C. §556(d). *Greenwich Collieries* does not affect the proposition for which the *Martin* court, or this Court, cites *Transportation Management Corp.*

[4] The Civil Rights Act of 1991, Pub.L. 102-166, 105 Stat. 1071 (Nov. 21. 1991), reversed or modified several Supreme Court cases including *Price Waterhouse.* However, that Act did not affect the proposition for which the *Martin* and *Robinson* courts*,* as well as this Court, cite *Price Waterhouse*.

> Discriminatory motivation under the USERRA may be reasonably inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Sheehan v. Dept. of Navy,* 240 F.3d 1009, 1014 (Fed. Cir. 2001) citing *W.F. Bolin, supra.*

Mr. LeBoeuf admits that he does not have any direct evidence that HP discriminated against him on the basis of his military reserves service. LeBoeuf Depo. at 73-79. Hence, Mr. LeBoeuf must establish a *prima facie* case with circumstantial evidence and the Court therefore turns to the four (4) factors identified by the *Sheehan* court.

Mr. LeBoeuf's claim that HP violated the USERRA when, as a result of the November, 2001, reorganization of the Midwest Region, it transferred him from Mr. Potts' supervision to Mr. Schleuter's supervision and took away some of his accounts while assigning him to new accounts is without merit.

Mr. LeBoeuf has arguably satisfied the first *Sheehan* factor. It is clear from the record as it currently stands before the Court, that in August, 2001, Mr. LeBoeuf participated in military reserves training for a two-week period. It is also clear that, unlike previous years during which Mr. LeBoeuf fulfilled his military commitment primarily over weekends, the August, 2001, session was the first time that Mr. LeBouef was required to attend training for a continuous period of time. As noted above, HP's reorganization occurred in November, 2001, only about three (3) months after Mr. LeBoeuf's military training session. This Court concludes that under these circumstances, HP's reorganization was sufficiently close in time to Mr. LeBoeuf's military activity to permit a jury

14

reasonably to infer a relationship between the two.

Although there is arguably an inferred relationship between Mr. LeBoeuf's August, 2001, military leave and HP's November, 2001, reorganization, HP's other actions related to the reorganization do not support a conclusion that Mr. LeBoeuf's military leave was a motivating factor in HP's decision to reassign Mr. LeBoeuf to a different manager and to different accounts. Specifically, the unopposed evidence establishes that in addition to reassignment of Mr. LeBoeuf, HP reassigned other HP sales representatives according to where each representative lived. In addition, the reorganization affected the assigned accounts of other sales representatives. Indeed, the reorganization affected the entire Midwest Region.

Mr. LeBoeuf points to two conversations he had with Mr. Potts and Mr. Strubel in the several weeks following the September 11, 2001, terrorist attacks as evidence of HP's hostility towards members of the military reserves. The first two such conversations are the ones in which Mr. Potts and Mr. Strubel inquired whether Mr. LeBoeuf thought he would be placed on active duty status in light of the events of September 11, 2001. However, the evidence establishes, and Mr. LeBoeuf acknowledges, that Mr. Potts and Mr. Strubel made their inquiries for the purpose of needing to plan staffing requirements for the new fiscal year. Indeed, the evidence establishes that following Mr. LeBoeuf's conversations with Mr. Potts and Mr. Strubel, HP engaged in a reorganization of the Midwest Region including the reassignment of personnel within the Midwest Region. It was certainly reasonable for HP to inquire about Mr. LeBouef's potential availability for purposes of not only planning for its staffing needs for the new fiscal year, but also for purposes of planning and executing its reorganization. Additionally, Mr. Leboeuf acknowledges that in response to Mr. Potts' initial inquiry as to whether he would be available to HP for staffing purposes, Mr. LeBouef

commented that he would probably make more money on active duty than he was making in his job with HP. It was not unreasonable, then, for Mr. Strubel to follow up with Mr. LeBouef and ask whether he thought he would go on active military duty or be available to HP.

Mr. LeBoeuf also points to Mr. Potts' questioning comment as to whether Mr. LeBouef would "rather be shot" than work at HP as evidence of HP's hostility towards him based on his military reserves obligation. Mr. LeBouef also relies on Mr. Potts' reference to Mr. LeBouef as a "weekend warrior". However, under the facts of this case, Mr. Potts' remarks are likened to a "stray remark" that is insufficient to support a finding of discrimination in a Title VII action. Indeed, Mr. LeBoeuf admits that, until now, he never complained to anyone, including Mr. Potts, that he found either of Mr. Potts' remarks offensive. In addition, at the time Mr. Potts interviewed Mr. LeBoeuf in about April, 1998, he and Mr. LeBouef discussed Mr. LeBoeuf's military reserves commitment making HP, through Mr. Potts, aware of that obligation. Nevertheless, even in light of that military reserves obligation, Mr. Potts hired Mr. LeBouef for a position with HP.

Finally, Mr. LeBouef has not produced any evidence that HP treated differently any employees who were not entitled to USERRA protections. As noted above, when HP reorganized the Midwest Region, other employees were transferred from one manager to another and were affected by the reassignment of accounts.

The Court reaches the same result with respect to Mr. Le Boeuf's claim that HP violated the USERRA when it terminated his employment in September, 2002. Again, Mr. LeBouef's September, 2002, termination was sufficiently close in time to his August, 2002, military activity to permit a jury reasonably to infer a relationship between the two. Accordingly, Mr. LeBouef has, at this stage of the litigation, arguably satisfied the first *Sheehan* factor. However, like his claim

16

related to the events of 2001, Mr. LeBouef cannot satisfy the remaining *Sheehan* factors.

First, the unopposed evidence is that HP implemented a company-wide reduction in force in 2002 which affected employees throughout the United States. Particularly included were, in addition to Mr. LeBoeuf, two other HP employees in the Midwest Region, neither of whom were entitled to USERRA protections. Further, HP never replaced Mr. LeBouef with someone who is not entitled to USERRA protections.[5] Finally, Mr. LeBouef does not dispute that HP considered a variety of factors in deciding which of its employees to lay-off including the excess number of sales representatives in southern Ohio and his overall job performance.

Mr. LeBouef seems to allege that the fact that the individual he spoke with in human resources did not know anything about HP's military leave policy reflects HP's hostility towards individuals who have military reserves obligations. However, the fact that one individual in the human resources department was not familiar with HP's military leave policy does not reflect any hostility by HP towards individuals who have military reserves obligations particularly in light of the fact that HP indeed has a policy and that it abided by that policy. Moreover, HP's long-term history of dealing with Mr. LeBouef's military reserve obligations during the entire time he worked at HP belies any suggestion that it was hostile towards anyone protected by USERRA. Specifically, as noted above, HP was well aware of Mr. LeBoeuf's military reserve commitment when it hired him. In addition, every time Mr. LeBouef was absent from his job with HP due to his military reserves obligation, HP paid Mr. LeBouef the difference between his military pay and his HP salary and kept him in its fringe benefit program. Further, each time Mr. LeBouef completed his military reserves training, he returned to the same position with HP at the same rate of pay.

---

[5] This Court is not suggesting that this is an element of an USERRA claim but, at this stage of the litigation, simply makes the observation.

17

Finally, there is absolutely no evidence that HP treated more favorably any other employees who were not entitled to USERRA protections. As noted above, the 2002, reduction in force was company wide. It affected employees throughout the United States including two other employees in the Midwest Region who were not entitled to USERRA protections.

As with his claim related to HP's 2001 reorganization, while Mr. LeBouef arguably satisfies the first *Sheehan* factor with respect to his claim based on HP's termination of his employment, he is unable to satisfy the remaining factors.

This Court concludes that Mr. LeBouef is unable to establish a *prima facie* case under USERRA. It is therefore recommended that Defendant Hewlett-Packard Company's Motion for Summary Judgment be granted and that judgment be entered in favor of Defendant and against Plaintiff George R. LeBoeuf, dismissing the Complaint with prejudice.

February 8, 2006.

                                                     s/ **Michael R. Merz**
                                              Chief United States Magistrate Judge

J:\LeBoeuf_MSJ.wpd

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems

sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).